FILED

07/12/2019

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

April 2, 2019 Session

**STATE OF TENNESSEE v. QUADARIOUS DEVONTA BUFFORD**

**Appeal from the Circuit Court for Gibson County**
**No. 9538      Clayburn Peeples, Judge**

———————————————————

**No. W2018-00548-CCA-R3-CD**

———————————————————

The Defendant, Quadarious Devonta Bufford, was convicted by a Gibson County Circuit
Court jury of first degree felony murder during the perpetration of aggravated child abuse
and sentenced by the trial court to life imprisonment. On appeal, he argues that the
evidence was insufficient to sustain his conviction, and the State committed reversible
error by failing to make an election of offenses. Following our review, we affirm the
judgment of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT
WILLIAMS, P.J., and TIMOTHY L. EASTER, J., joined.

Alexander D. Camp, Jackson, Tennessee (on appeal); and Daniel Rogers and Tom Crider,
Trenton, Tennessee (at trial), for the appellant, Quadarious Devonta Bufford.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant
Attorney General; Garry G. Brown, District Attorney General; and Daniel Rogers and
Tom Crider, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case arises out of the death of two-year-old victim,[1] who was the son of the
Defendant's girlfriend. On the morning of November 21, 2013, A.G. left the victim at

———

[1] In accordance with the policy of this court, we do not refer to the victim or his mother
by name.

home in the care of the Defendant while she first took her older child to school and then went to work. Although the victim had been suffering from an upset stomach for the previous two days, he appeared to be fine when the victim's mother left the home that morning. Approximately two hours later, the Defendant called to tell her that the victim was foaming at the mouth and unconscious, and she instructed him to call 911. When the first responder arrived at the home shortly after 10:20 a.m., he found the victim gasping for air. The victim was transported to a local hospital, from which he was airlifted to Le Bonheur Children's Hospital in Memphis, where he died during surgery that same day. The medical examiner who autopsied the victim's body determined that the cause of death was blunt force trauma to the victim's abdomen, that the manner of death was homicide, and that the lethal injuries were sustained within a short time before the victim was brought to the hospital. Because the victim was in the sole care of the Defendant during that time, the Defendant was indicted for first degree felony murder during the perpetration of aggravated child abuse.

## State's Proof

At the Defendant's September 15-16, 2015 trial, the victim's mother testified that the victim was two years and four months old at the time of his death. She said she lived at that time in Humboldt with the Defendant, the victim, and her eight-year-old child. She described a child abuse investigation involving the victim that was launched prior to November 21, 2013, as having stemmed from the victim's contracting a case of hand, foot, and mouth disease that caused his fingers to blister. She said when she took the victim back to the doctor's office after the blisters had spread to his feet, a physician who did not routinely treat him saw what appeared to be bite marks on his body and reported it as suspected child abuse. According to the victim's mother, her nephew was a known biter at that time, and the investigators concluded that the bite marks were from a child. Thus, no charges resulted in connection with the investigation.

The victim's mother testified that on the morning of November 21, 2013, she was running late, and as a consequence, things were "kind of chaotic[.]" She recalled that by the time she and her older child were getting ready to leave, the victim had gotten up and was following her from room to room in a clingy manner and crying because he wanted her to pick him up. She said the victim had been ill the previous two days, having vomited once on November 19 and several times during the day on November 20, but by bedtime on November 20, he had been feeling much better. When she left the house on the morning of November 21, the victim was sitting on her bed drinking Pedialyte from his sippy cup and watching television.

The victim's mother testified that she dropped her older child off at school, checked on a patient at a home in Humboldt as part of her job duties as a licensed

practical nurse, and then drove to her Jackson office. Once she arrived, the Defendant either texted or called her, and they had a brief conversation about his plans with the victim for the day. She believed the Defendant mentioned during that conversation that the victim was quietly watching television. The Defendant gave no indication that anything was wrong.

The next time the Defendant called, he told her that the victim had passed out and there was a white foamy substance coming out of his mouth. The victim's mother testified that she instructed the Defendant to call 911 on the house phone and to stay on the cell phone line with her. She said she and the Defendant got disconnected as she was trying to call the victim's father, and she could not recall if they ever got reconnected. In the meantime, one of the paramedics spoke with her on the phone and told her to meet them at the emergency room of the Humboldt General Hospital. When she arrived, the Defendant was pacing nervously and either would not, or could not, tell her what was happening with the victim. Eventually, a physician requested that they come to a family room, where he asked for a history of what had occurred prior to the 911 call and informed them that the victim had not been breathing when the ambulance arrived at their home.

The victim's mother testified that she told the physician about the victim's stomach illness, his episode of foot, hand, and mouth disease, and an incident that the Defendant had related to her that had occurred approximately a week and an half earlier at the park. According to what she learned from the Defendant, the victim had been standing at the bottom of a slide when another child came down the slide and accidentally kicked the victim in the stomach, causing bruises. She said the Defendant was present during the time she provided the history to the physician but, to her recollection, did not add anything to it.

The victim's mother testified that she, her aunt, and the Defendant left in a vehicle together for Memphis before the helicopter arrived to transport the victim. By the time they arrived at the hospital, the helicopter was landing on the rooftop. After a period of waiting, surgeons came in to apprise them of the victim's chances of survival before taking the victim into surgery. Sometime later, she was informed that the victim had died. The victim's mother testified that it was only after the victim's death that she learned the extent of his injuries and that they were acute, rather than the result of the earlier park accident. She said she gave a statement to Investigator Williams at the hospital and also gave him consent to search her home. She did not speak to the Defendant at Le Bonheur about what had happened, and she never again talked to him, although he had since tried to contact her.

Officer Joseph Evans of the Humboldt Police Department testified that he was dispatched to the Defendant's home at approximately 10:10 a.m. on November 21, 2013, and arrived a minute or two later to find the Defendant standing on the front porch holding the victim, who did not appear to be breathing. He said he asked the Defendant to place the victim on a couch inside the home, where he pulled the child's shirt up and observed red marks on his stomach. He stated that the victim was not breathing normally but instead was gasping every ten seconds. The Defendant told him that the red marks were caused by another child having kicked the victim in the stomach a week earlier when the victim was standing at the bottom of a park slide. The Defendant also told him that the victim had appeared fine earlier that morning when the Defendant saw him sitting in bed watching cartoons but was unresponsive when the Defendant later returned to the room.

Officer Evans testified that he was about to transport the victim to the hospital in his patrol vehicle when the ambulance arrived. He, therefore, carried the victim straight to the ambulance and then provided an escort all the way to the hospital. On cross-examination, he agreed that the Defendant was holding the victim "[c]radled in his arms" when he arrived and that the ambulance with the victim reached the hospital no more than ten or twelve minutes after Officer Evans was dispatched to the victim's home.

Dr. Miguel Laboy, the medical examiner who performed the autopsy, testified that the cause of death was blunt force trauma to the abdomen and the manner of death was homicide. He described the injuries to the victim's body, which included a laceration to his inner lip, an abrasion to his head, and multiple contusions, or bruises, all over his body, including to his head, mid-back, chest, abdomen, right leg, and around his anus. Dr. Laboy testified that the victim's duodenum, a portion of his small bowel, "was almost severed[,]" which can occur from the force of an impact to that side of the abdomen. In addition, there were the following injuries: a laceration to the victim's liver, "[m]eaning that some kind impact . . . squeezed that liver and ma[d]e a tear"; "marked" hemorrhaging, or bleeding, in the victim's pelvic area; and "hemorrhage to the [victim's] brain." According to Dr. Laboy, the victim's injuries were acute, which meant that they occurred within a short time before his death.

On cross-examination, Dr. Laboy disagreed that the victim's abdominal injuries were consistent with a 250-pound man having falling onto the victim's abdomen with his knee, testifying that he would expect more injury to other areas of the victim's body, including the ribs, if that had occurred.

Sharita Jones, an investigator with the Department of Children's Services ("DCS"), testified that she received a sexual and physical abuse referral for the victim on October 2, 2013. When she and Investigator Tony Williams of the Humboldt Police

Department arrived at the Jackson General Hospital in response to the referral, they found the victim and his mother in a room waiting for the sexual assault nurse examiner. Ms. Jones testified that the victim had some marks on his chest, and his fingertips were "red and puffy looking." No one was ever accused of anything in connection with their investigation, but she did perform a home visit on November 19, 2013, to ensure that the victim was seeing a dermatologist. During her visit, she noted that the home was clean and that the victim, who said his stomach was hurting, was "hanging around his mom." The victim's mother informed her that the victim had eaten a raw hotdog that had caused his stomach to hurt but that he was otherwise fine. Ms. Jones did not notice any bruising on the victim's body at that time.

Dr. Karen Lakin, an assistant professor of pediatrics at the University of Tennessee and the medical director for the "Le Bonheur Cares Program," who was accepted by the court as an expert in the field of child abuse pediatrics, testified that she was called to the operating room by the surgical team due to the victim's "very concerning injuries" that were immediately obvious. By the time she arrived, the victim had already died. She noted that the victim had "a lot of bruises over his forehead, and extending into the . . . upper chest area[,]" scattered bruising on his extremities, scattered injuries to the back area, areas of bruising to his lower back just above his anus, "somewhat symmetrical" areas of bruising along the side of the anus, an area of abrasion at the top of the anus, and swelling and bruising to the scrotal area. From the treating physicians and from her review of the autopsy report, she learned that the victim had "significant amounts of blood in the peritoneal cavity," with the source being tears in the mesentery, or the "sheet of tissue" that connects abdominal organs to the back wall. She also learned that the victim had a severe laceration to his liver and that a portion of his small intestine had been "almost completely cut in half, which is obviously lethal." Upon reviewing his laboratory work, she noted that his hemoglobin count dropped dramatically during the twenty-minute span it took for him to be transported from the Humboldt General Hospital to Le Bonheur, going from 8.8 or 8.9 to 3.3, which was "very significant."

Dr. Lakin testified that the patient history supplied by the victim's mother included the victim's food-borne illness and the slide accident. She said they did not receive any history of the victim's having fallen off a bed or of someone's having fallen on top of him. Based on her review of the case, she determined to a reasonable degree of medical certainty that the victim's death occurred as the result of non-accidental blunt force trauma and that the injuries were sustained within a short period of time before his death. She explained that, absent being involved in a motor vehicle crash or other similar traumatic known accident, "children that are otherwise healthy and watching cartoons do not end up three hours later dying in the OR from bleeding out to death from lacerations

to the mesentery and to the liver." She further explained her opinion as to when the injuries occurred:

> It would be sometime between his period of time when he appeared to be well and watching cartoons and probably very closely in point in time from when he was seen by the paramedics. I base that opinion on his rapid drop in his hematocrit from -- going from about 9 to 3 in such a short period of time. You just can't survive very long and have it drop that quick. That's a very rapid drop. That's not a slow bleed. That's a very extremely rapid drop.

Lieutenant Tony Williams of the Humboldt Police Department, the investigator assigned to the case, testified that when he arrived at the Humboldt General Hospital, physicians were performing CPR on the victim. He said he stood in the doorway and watched the medical personnel working on the victim for over an hour until the victim was LifeFlighted to Le Bonheur. At one point, one of the nurses called him over to look at bruising around the victim's anal area. After the helicopter arrived to transport the victim, he called DCS and made arrangements to meet with Sharita Jones to drive to Memphis. En route, he received word that the victim had died on the operating table.

Lieutenant Williams testified that upon their arrival at the hospital, he and Ms. Jones donned surgical garb and went into the operating room, where he took photographs of the body, including the areas that the surgeon pointed out as appearing suspicious. He said he observed numerous bruises on the victim's back, abdomen, chest, and head. After viewing the body, he conducted separate interviews of the Defendant and the victim's mother at the hospital. He identified the recording of his hospital interview with the Defendant, which was admitted as an exhibit and published to the jury. During that interview, the Defendant said nothing about the victim's having fallen off his bunk bed or the Defendant's having fallen on top of him.

Lieutenant Williams further testified that he obtained the victim's mother's permission to search the home and returned to Humboldt, where he examined and took photographs of the duplex in which the victim had been living. He said he found no blood or other signs that anything out of the ordinary had taken place in the children's bedroom and was unable to find any evidence to corroborate the Defendant's claim that the victim had thrown up on the bed in the Defendant's bedroom. He was, however, able to confirm the Defendant's account of the slide accident through his forensic interview of the victim's mother's older child. He also confirmed that only four individuals were in the victim's home on the morning that he died: the victim, the Defendant, the victim's mother, and her older child.

- 6 -

Dr. Kaushal Patel, the emergency physician who treated the victim at the Humboldt General Hospital, testified that the victim was not breathing and had no heart rate or pulse when he arrived at the emergency room. After intubating him and restarting his heart, he took a moment to talk to the Defendant, who told him that he and the victim had been watching television when the victim became unresponsive. The Defendant did not report any accidents or anything else out of the ordinary. However, during a later conversation, the Defendant provided additional information about the victim's having been kicked in the stomach a few days earlier.

## **Defendant's Proof**

The twenty-three-year-old Defendant testified that he graduated from high school in Humboldt, served in the United States Army National Guard, and attended the University of Tennessee at Martin. He said he was employed as a home health worker at "R and J" in Trenton at the time of the incident but on that day was home because he had traded shifts with a co-worker. He stated that he and the victim were watching television together in his and the victim's mother's bedroom when the victim's mother and her older child left the home at approximately 8:00 a.m. The victim appeared to be fine, although he was still recovering from a stomach illness he had suffered earlier in the week. At some point that morning, the victim's mother called him, and the victim talked to her on the phone. Afterwards, he sent the victim to the children's bedroom to play.

The Defendant testified that he later walked into the children's bedroom to find that the victim had climbed to the top bunk of the bunkbed. He said he began playing with the victim, standing in front of the bed and reaching over to flip the victim over. He said he never climbed on the top bunk but did eventually get on the bottom bunk, where he "was basically moving from side to side playing with [the victim], teasing him." He stated that the victim was happy and laughing. They continued with the game for a while, until they both "stopped to watch TV[,] and [the victim] fell off the bunk."

The Defendant testified that the victim fell from the top bunk to the hardwood floor, striking the bed post on his way down and landing on his back. He said he rushed to get the victim but tripped on a broken part of the bed and fell on top of him, with his knee "going into [the victim's] stomach." The Defendant estimated that he weighed approximately 250 pounds at that time and testified that he fell with his whole weight onto the victim. He stated that the victim began crying loudly, so he picked him up, carried him to his bedroom, and began rocking him in his arms as he sat on his bed. The victim appeared as if he were about to vomit, so he leaned him forward, but nothing but "slob" came out of the victim's mouth. When he leaned the victim back, the victim's body went limp, and he became unconscious. At that point, he called the victim's

- 7 -

mother. He then called 911 on the house phone. When he heard the police sirens, he ran with the victim outside to the front porch.

The Defendant testified that Officer Evans asked what had happened, and he told Officer Evans about the park accident with the slide. The ambulance arrived soon after, and the Defendant rode to the hospital with Chief Ellis of the Humboldt Police Department. The Defendant said that he was very distraught and nervous at the Humboldt hospital and could not recall having any conversation with Dr. Patel. He acknowledged that he did not tell Investigator Williams during his interview at Le Bonheur about the victim's fall from the bunk bed or his fall onto the victim. He explained he was very scared and unable to think clearly at that time. He said he did not later tell the truth about what had happened because Investigator Williams called it a homicide, and he was too frightened to speak up. The Defendant testified that he had never before been in trouble and that his testimony before the jury was truthful, although his statement to Investigator Williams was not.

On cross-examination, the Defendant acknowledged that he caused the injuries to the victim but again claimed that they occurred as the result of his having fallen onto the victim as he rushed to his aid when the victim fell from the bunkbed.

Following deliberations, the jury convicted the Defendant of first degree murder during the perpetration of aggravated child abuse, and the trial court subsequently sentenced him to life imprisonment. On November 19, 2015, the Defendant, through new counsel, filed a motion for new trial in which he raised two issues: the sufficiency of the evidence and the ineffective assistance of trial counsel.[2] At the hearing on the motion for new trial, held on January 8 and February 23, 2018,[3] the Defendant's counsel argued only the ineffective assistance of trial counsel issue. On February 23, 2018, and again on April 2, 2018, the trial court entered orders overruling the motion for new trial. On March 26, 2018, the Defendant filed his notice of appeal to this court.

## ANALYSIS

### I. Sufficiency of the Evidence

---

[2] Although counsel expressed his intention of amending the motion for new trial to add additional issues following his review of the transcripts, there is no amended motion for new trial included in the record on appeal.

[3] There is no explanation in the record for why so much time elapsed from the filing of the motion for new trial until the hearing was held. There is also no explanation in the record for why the trial court entered two orders denying the motion for new trial.

The Defendant first contends that the evidence is insufficient to sustain his conviction, arguing that there was no proof that he intentionally inflicted any injury to the victim. In support, he cites his having immediately called the victim's mother and followed her instructions to call 911 when he saw that the victim was in distress, the fact that he was cradling the victim in his arms when the first responder arrived at the home, the lack of proof he had any motive to harm the child, and the fact that there was no evidence he had a violent history or prior conduct of child abuse. He asserts that his explanation of the victim's having fallen from the top bunk and his having accidentally fallen on top of the victim, a scenario that he claims was unchallenged by the State, could account for the lethal blunt force trauma that the victim sustained. The State disagrees that the evidence was insufficient to sustain the conviction, citing, among other things, the testimony of the two physicians that the injuries were non-accidental, along with the Defendant's failure to offer any alternative explanation for the injuries until trial. We agree with the State.

When the sufficiency of the convicting evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). It is not the role of this court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

For the purposes of this case, first degree murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . aggravated child

abuse[.]" Tenn. Code Ann. § 39-13-202(a)(2). Aggravated child abuse occurs when a person commits child abuse and the act of abuse "results in serious bodily injury to the child[,]" or the act of abuse "was especially heinous, atrocious or cruel, or involved the infliction of torture to the victim." Id. §§ 39-15-402(a)(1), (3). Child abuse occurs when a person "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury[.]" Id. § 39-15-401(a).

Viewed in the light most favorable to the State, the evidence was sufficient for a rational jury to find the Defendant guilty of the indicted offense beyond a reasonable doubt. According to the medical examiner and the Le Bonheur expert in child abuse, the victim died of acute blunt force trauma. Both physicians were adamant that the injuries were non-accidental and that they occurred within a very short window of time before the presentation of symptoms. During that period of time, the victim was in the sole care of the Defendant. The Defendant failed to say anything before trial about the victim's alleged fall from the bunkbed or his alleged fall onto the victim, either to the first responders and medical personnel who were seeking insight into the victim's condition in order to treat him, or to the police investigator who interviewed him after the victim's death. Moreover, despite the Defendant's assertion that the accidental injury account he provided at trial was unchallenged by the State, the medical examiner specifically testified that the victim's injuries were not consistent with a 250-pound man having fallen onto the victim. We, therefore, affirm the Defendant's conviction for first degree felony murder in the perpetration of aggravated child abuse.

## II. Election of Offenses

The Defendant next contends that the State committed reversible error by failing to make an election of offenses. Specifically, he argues that the State should have declared whether it intended to prove the aggravated child abuse element of the offense by establishing "serious bodily injury" or by establishing that "the act of abuse was especially heinous, atrocious, or cruel." The State responds by arguing that the Defendant has waived this issue by failing to raise it at trial, include it in his motion for new trial, or include an adequate record for appellate review. The State further argues that the Defendant is not entitled to plain error review because he not only failed to request plain error review but also failed to include an adequate record for a plain error analysis of the issue. Finally, the State argues that no election of offenses was required because there was only one episode that caused the victim's injuries and death, for which the State could present alternative theories without violating the Defendant's right to a unanimous verdict.

After the briefs were filed, the Defendant supplemented the record with the transcript of the closing arguments and jury charge. Nonetheless, we agree with the State

that the Defendant has waived this issue on appeal. As the State points out, the Defendant did not raise the issue at trial or in his motion for new trial. See State v. Smith, 492 S.W.3d 224, 232 (Tenn. 2016) (stating that failure to raise an election of offenses issue in the trial court waives direct appellate review but does not preclude plain error review).

We further agree with the State that, even if not waived, the Defendant cannot show that any election of offenses was required. The doctrine of election of offenses requires that when there is evidence at trial that a defendant has committed multiple offenses against a victim, the State must elect the facts upon which it is relying to establish each charged offense. State v. Johnson, 53 S.W.3d 628, 630 (Tenn. 2001) (citations omitted). When, however, there is evidence of only one offense, which can be committed in alternate ways, there is no need for the State to elect the theory under which it seeks conviction. See State v. Keen, 31 S.W.3d 196, 208 (Tenn. 2000) ("Our research reveals no case . . . in which we have held that the right to a unanimous jury verdict encompasses the right to have the jury unanimously agree as to the particular theory of guilt supporting conviction for a single crime.") (citations omitted). We conclude, therefore, that the Defendant is not entitled to relief on the basis of this issue.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE